U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2009 MAY 29  PM 2: 08

CLERK

BY_____
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

--------------------------------------------------------------------x

JACQUELINE A. RUDMAN, A/K/A
JACQUELINE RUDMAN JURKOWICZ,
on behalf of herself and all others similarly situated,

                    Plaintiff,

      -against-

DAIRY FARMERS OF AMERICA, INC.; and
KELLER'S CREAMERY, LP

                  Defendants.

--------------------------------------------------------------------x

Civil Action No.

2:09-cv-134

CLASS ACTION COMPLAINT

JURY TRIAL DEMAND

       Plaintiff, on behalf of herself and all others similarly situated, brings this action for

damages, disgorgement, injunctive relief and costs of suit including reasonable attorneys' fees

for injuries to herself and members of the proposed class she represents. The allegations set

forth below are based upon information and belief pursuant to the investigation of counsel,

except as to those allegations regarding herself.

## INTRODUCTION

     1.    This action arises from defendants' conspiracy to fix, stabilize, raise and maintain

the wholesale price of milk and cheese. To further their conspiracy, defendants manipulated and

raised the prices for cheese on the Chicago Mercantile Exchange ("CME") Cheese Spot Call

Auction market. They did so because these contracts are used as a basis for the milk contract

prices with the United States Department of Agriculture ("USDA") and wholesale whole milk

and cheese prices with their customers. Defendants' primary business is the sale of milk and to

a lesser extent, cheese. The CME cheese market is thinly traded representing about one percent

of the nationwide supply of cheese. Accordingly, the loss that was suffered from buying these

limited number of cheese contracts on the CME was more than off-set by the profits it made from the increase in milk and cheese prices caused by the engineered spike in CME cheese spot prices.

2.      This behavior strips the defendants of any immunity under the Capper-Volstead Act. It renders the defendants – cooperatives of 18,000 dairy farmers – liable as naked combinations among competitors in unreasonable restraint of trade.

3.      On December 18, 2008, the Commodity Futures Trading Commission ("CFTC") concluded its investigation of defendant Dairy Farmers of America, Inc.'s ("DFA") trading activity and ordered DFA to pay a $12 million fine for its market manipulation of the CME. The order was the result of an agreement between the CFTC and DFA and does not purport to address the entirety of DFA's illegal conduct.

4.      Indeed, manipulation of cash commodity markets such as the CME Cheese Spot Call Auction market falls outside the CFTC's jurisdiction unless it impacts commodities futures trading. Thus, the CFTC's investigation of such conduct is necessarily limited and does not purport to address the entirety of DFA's conduct relating to the CME Cheese Spot Call Auction market.

5.      As a direct, foreseeable and intended result of defendant's scheme, plaintiff and the Class paid artificially inflated prices for Cheese Products (as defined below) at retail establishments throughout the United States.

### JURISDICTION AND VENUE

6.      Plaintiff's and class members' claims arise under §§ 1 and 2 of the Sherman Act (15 U.S.C. §§ 1 & 2) and the antitrust and consumer protection statutes and common law of 48 states and the District of Columbia. This Court has original jurisdiction over the federal claims

2

pursuant to § 16 of the Clayton Act (15 U.S.C. § 26) and 28 U.S.C. §§ 1331 and 1337. This Court also has jurisdiction over this entire action pursuant to 28 U.S.C. § 1332(d) because one plaintiff and one defendant are citizens of different states and the amount-in-controversy sought on behalf of the Class exceeds $5 million exclusive of interest and costs. In addition, this Court has supplemental jurisdiction over the state claims pursuant to 28 U.S.C. § 1367 because they arise out of a common nucleus of operative facts of the federal claims asserted in this action.

      7.     Venue is proper in the District of Vermont pursuant to § 12 of the Sherman Act (15 U.S.C. § 22) and 28 U.S.C. § 1391 because defendants transact business and may be found in this District.

      8.     Defendants' activities were intended to, and did have, a substantial effect on interstate commerce. They had a substantial intended, direct and foreseeable effect on the prices of milk and cheese throughout the continental United States and the District of Columbia.

PARTIES

Plaintiff

      9.     Plaintiff Jacqueline A. Rudman, a/k/a Jacqueline Rudman Jurkowicz, is a citizen of the State of New York. She purchased one or more Cheese Products indirectly for herself and not for resale from the DFA Family and Keller's between April 14, 2004 and December 16, 2008.

The DFA Family

      10.    Defendant Dairy Farmers of America, Inc. is a not-for-profit corporation organized and existing under the laws of the State of Kansas with its principal place of business in Kansas City, Missouri. DFA is a vertically integrated cooperative of 18,000 raw milk producers in 48 states and owns and operates its own hauling companies, processing plants and distribution centers for milk and cheese throughout the country.

3

11.    Defendant Keller's Creamery LP ("Keller's") is a limited partnership with its principal place of business in Kansas City, Missouri. In or about January 2005, DFA acquired Keller's. Until that time, DFA had no control of Keller's. Keller's manufactures and sells dairy products and until DFA's acquisition of it, Keller's competed with DFA.

12.    National Dairy Holdings, LP ("NDH") is a limited partnership organized and existing under Delaware law with its principal place of business in Dallas, Texas. NDH is one of the largest dairy processors in the United States. NDH is the parent company of Borden Dairy, Meadow Gold, Flav-O-Rich and Dairy Fresh. NDH's direct or indirect subsidiaries own and operate plants that process DFA's raw milk. Until May 2009, DFA owned an 87.5 percent common equity interest and 92 percent preferred equity interest in NDH.

13.    DFA, NDH (before DFA's sale of its interest) and Keller's (after its acquisition by DFA) and their direct and indirect subsidiaries and any and all other entities in which DFA has or had control since April 2004 are hereinafter referred to as the DFA Family.

14.    The DFA Family manufacture and sell milk, cheese and butter throughout the United States under the brand names, *inter alia*, Borden, Mid-America Farms, Hotel Bar, Breakstone's, Plugra, Roberts, Hiland Dairy Foods, Stremick's-Heritage Foods, Wilcox Dairy Farms, HP Hood, Meadow Gold, Flav-O-Rich, Dairy Fresh, Helluva Goods, Maggio, Penn Maid, Dairymens, Chattanooga Dairy, Velda Farms, Coburg Milk, Goldenrod Dairy Foods, Cream O Webber and Stinton Dairy.

## CO-CONSPIRATORS

15.    Various individuals and entities that are presently unknown to plaintiff participated as co-conspirators with defendant in the wrongful conduct alleged herein and have engaged in conduct and made statements in furtherance of the conspiracy.

4

16.     The acts charged in this Complaint were done or authorized by defendants' or

their co-conspirators' officers including but not limited to Gerald Bos (DFA's Chief Financial

Officer from January 1, 1998 to December 31, 2005), Gary Hanman (DFA's President and Chief

Executive Officer from January 1, 1998 to December 31, 2005), Frank Otis (Keller's Chief

Executive Officer) and Glenn Millar (Keller's Vice President of Procurement Operations),

agents, employees or representative while actively engaged in the management of their business

or affairs.

### THE CME AND ITS EFFECT ON MILK AND CHEESE PRICES

**The CME Cheese Spot Call Auction Market Is a Relevant Market**

17.     The CME is a commodity exchange.  To the extent that commodity futures

contracts are traded on the CME, the CME must be licensed by the CFTC pursuant to the

Commodity Exchange Act (7 U.S.C. § 1 *et seq.*).  To receive a license, the CFTC was required

to, and did in fact, determine that the CME has adequate rules and policies that if obeyed would

prevent market manipulation.

18.     Cash markets on the CME such as the Cheese Spot Call Auction market are

unregulated by any government agency and fall outside the scope of the CFTC's jurisdiction.

The CFTC can only investigate trading in such markets to the extent it impacts commodity

futures trading.

19.     The CME is not a member of the DFA, Keller's or any cooperative.  It is not a

producer of agricultural products or a cooperative of producers of agricultural products.  It is not

engaged in the processing, preparing for market, handling, or marketing of agricultural products.

20.     The CME Cheese Spot Call Auction market conducts trading in both cheddar

cheese 40-pound blocks and 500-pound barrels during 15-minute weekday sessions.  CME

members trade cheddar cheese blocks by posting bids and offers on a board. The final transaction price or the final unfilled bid or offer, if different from the last transaction price, during the trading session determines the block and barrel settlement prices for the day.

21.     The CME Cheese Spot Call Auction market is the only commodity exchange market for cheddar cheese in the United States. It brings together participants in the cheese industry that have interests in buying or selling cheese for immediate delivery.

22.     The CME has created a uniquely efficient market for the trading of cheddar cheese for immediate delivery by, among other things, creating standardized contract terms, rules governing trading behavior and public schedule for trading. Chapter 53S of the CME Rulebook provides detailed standardized contract terms that include specifications on the quality and color of the cheese; quantities of cheese; settlement procedures for transactions; allowances for deviations from contract terms; the method to calculate freight charges for shipments; packaging; reimbursement for the cost of packaging; rules governing inspection of the cheese; arbitration for disputes and a method to calculate compensation in the event of default. These rules minimize the transaction costs for traders.

23.     Because no government entity has authority to regulate cash price commodity exchange markets, the CME fills the gap with its own rules and enforcement mechanisms to minimize manipulation of prices on the exchange. The CME can impose fines of up to $1,000,000 on its members for each violation of its rules.

24.     Because of its unique attributes, traders on the exchange, including participants in the dairy industry, do not have any reasonably available alternatives to the CME Cheese Spot Call Auction market to conduct the transactions for which they use that market.

**Manipulation of the CME Cheese Spot Call Auction Market**

25.    At all relevant times, defendants knew that the CME Cheese Spot Call Auction market was vulnerable to manipulation as it comprises less than two percent of the annual U.S. supply of cheddar cheese.

26.    Defendants knew that since 1999 or earlier "the Chicago Mercantile Exchange (CME) ... spot cheese market ... impacts the prices of virtually all cheese traded in the United States as well as producer milk prices and milk futures contracts.  ...  Cheese producers generally use CME spot cheese market prices to set their sales prices, according to industry participants. In turn, minimum prices for raw farm milk bought by many cheese manufacturers are set using a U.S. Department of Agriculture (USDA) pricing formula whose most significant commodity component is the weekly average of cheddar cheese prices drawn from a survey of large cheese manufacturing plants.  Futures contracts for milk used in manufacturing cheese are also settled at expiration using the minimum price for milk as determined by the pricing formula." *Spot Cheese Market: Market Oversight Has Increased, But Concerns Remain about Potential Manipulation* ("GAO Report") at 5 (June 2007).  Available at http://www.gao.gov/new.items/d07707.pdf.

27.    Thus, defendants knew that manipulation of the CME Cheese Spot Call Auction market that would cause an artificial increase in the prices on that market would have the effect of increasing the prices of wholesale milk and cheese and USDA Class III fluid milk prices throughout the United States.  Class III fluid milk is used to produce all cheeses (other than cottage cheese), including but not limited to hard and soft cheeses, cream cheese, stirred cheese curd, and creamy cheese bases or mixes ("Cheese Products").

28.    Defendants also knew that the CME Cheese Spot Call Auction market was vulnerable to manipulation because (1) it is thinly traded; (2) a relatively few number of traders

7

make the predominate number of transactions; and (3) the pricing structure does not necessarily reflect the actual cost of buying and selling cheese.

29.    As the GAO explained, "the spot cheese market remains a thin market, which in combination with the presence of a small number of traders that make a majority of trades and the spot cheese market's pricing structure contributes to questions about the potential for price manipulation. A thin market generally has either few transactions; transactions that represent only a small proportion of the total transactions, including those that are priced off that market; or both. ... Little trading occurs on the CME spot cheese market, and the trading that does take place consistently represents a small proportion of the total volume of cheese produced in the United States. ... [T]he volume of cheese traded at CME generally represented less than 2 percent of all cheddar cheese and less than 1 percent of all cheese produced in the United States annually. ... [T]hin markets raise concerns about the potential for manipulation because of the small number of participants and transactions involved in the market and the ease with which prices can be impacted. For example, in thinly traded markets each individual participant's activity tends to be more influential than it would be on a market with more transactions and more participants. As a result, it may be easier for a market participant to move prices in a preferred direction over a short period of time with relatively few completed or unfilled transactions. Further, individual transactions to buy and sell cheese that set the market price may not accurately reflect supply and demand. Further, the CME spot cheese market has a small number of traders who make the majority of trades, another factor that contributes to questions about possible price manipulation. ... The CME spot cheese market's pricing structure, in combination with a thinly traded market and a small number of traders who comprise the majority of trading, contributes to questions about the potential for price manipulation. ...

8

[P]rices at the CME spot cheese market are based on completed transactions and on unfilled

higher bids and uncovered lower offers that are posted by market participants. During a trading

session an unfilled bid that is higher than the previous bid or transaction price can result in a

higher price. Similarly, an uncovered offer that is lower than the previous offer or transaction

price can result in a lower price. ... [T]his pricing structure may increase opportunities to

ultimately change the price of milk without reference to the actual costs of buying and selling

cheese." GAO Report at 9-13.

30.     In its Order, the CFTC found "[b]eginning on April 14, 2004, as sellers offered

cheddar blocks on the CME Cheese Spot Call, DFA purchased block cheddar cheese. From May

21 to June 23, 2004, DFA ... purchased and took delivery of a total of 323 loads (approximately

40,000 pounds per load) of cheddar cheese blocks at $1.80 per pound on the CME Cheese Spot

Call. During this period, DFA was the sole purchaser of cheddar cheese blocks on the CME."

Order at 2-3.

31.     Defendants' continued their market manipulation after June 23, 2004. For

example, DFA made large purchases of CME cheddar cheese blocks in August and September

2004 when it purchased about 100 truckloads of cheese.

32.     DFA cornered the market giving it a 100 percent market share in the CME Cheese

Spot Call Auction market during the periods of time when it purchased inordinate amounts of

cheddar cheese blocks on the CME.

33.     DFA processed and sold the cheese that it purchased on the CME outside of the

CME at a substantial loss.

34.     The purchases of these large quantities of cheese on the CME, and subsequent

sale of that cheese at a loss would make no economic sense with solely respect to its trading

activities on the CME.  It was only rational, profit-maximizing behavior because it allowed defendants to secure artificially inflated prices on its subsequent sales of raw milk, cheese and processed dairy products.

35.     DFA admitted that its market manipulation scheme in 2004 increased revenue to dairy farmers by $1.3 billion, $278 million of which went to its members.

## AFFIRMATIVE CONCEALMENT

36.     Defendants made false public statements about the nature of its trading activities in furtherance of the conspiracy.  For example, in a December 30, 2004 article, the *Chicago Tribune* reported that it was advised by the DFA that its trading activities on CME Cheese Spot Call Auction market were "proprietary."

37.     There was nothing "proprietary" about the DFA's trading activities.  They were simply a naked manipulation of the CME Cheese Spot Call Auction market through purchasing all available cheese on that market.

38.     Defendants knew that unless they revealed these activities, they would be impossible to detect because the identity of trading participants on the CME Cheese Spot Call Auction market are secret.

39.     Plaintiff did not and could not discover through reasonable diligence the conspiracy and market manipulation scheme until the CFTC publicly announced its findings on December 16, 2008.

## INJURY

40.     As a direct and foreseeable consequence of defendants' illegal behavior, plaintiff and the Class members have been injured in their property in a manner that the federal and state antitrust and consumer protection laws were designed to protect.  They have been required to pay

more for Cheese Products than they would have in the absence of the wrongful conduct.

Defendants' wrongful conduct has resulted in artificially inflated prices on Cheese Products

throughout the continental United States and District of Columbia.

## CLASS ACTION ALLEGATIONS

41.     Plaintiff brings this action on her own behalf and on behalf of all others

similarly situated. The "Class" is defined as:

> All persons or other legal entities (excluding governmental entities,
> defendants, their officers, directors, subsidiaries or affiliates), who
> purchased Cheese Products indirectly for themselves and not for resale in
> the continental United States and District of Columbia, between April 14,
> 2004 and December 16, 2008.

42.     The members of the Class are so numerous that joinder of all of them would be

impracticable. The exact number of Class members is unknown by plaintiff at this time, but

plaintiff believes them to number in the millions.

43.     Plaintiff's claims are typical of the Class members. Plaintiff and all Class

members were impacted and damaged in the same manner by defendants' wrongful conduct.

Plaintiff and the Class members purchased Cheese Products at artificially inflated prices because

of defendant's wrongful conduct.

44.     Plaintiff will fairly and adequately protect the interest of the Class. Plaintiff's

interests are coincident with, and not antagonistic to, those of the Class. Plaintiff also has

retained counsel who have experience in the litigation of complex antitrust class actions

including of the type of claims alleged herein.

45.     Questions of law and fact common to the Class members predominate over

questions that may affect only individual Class members. Defendants have acted on grounds

generally applicable to the entire Class. Common questions of law and fact include, but are not

limited to:

11

a.  Whether defendants conspired to fix, raise, maintain or stabilize prices for wholesale milk and cheese;

b.  Whether the CME Cheese Spot Call Auction market is a relevant market;

c.  Whether DFA acquired market power in the CME Cheese Spot Call Auction market;

d.  Whether defendants' conduct violated § 1 of the Sherman Act;

e.  Whether DFA's conduct violated § 2 of the Sherman Act;

f.  When defendants took affirmative steps to conceal its illegal behavior;

g.  Whether defendants' conduct caused the prices that plaintiff and the Class paid for Cheese Products to be higher than they would have been in the absence of the wrongful conduct;

h.  Whether defendants' conduct violated the state statutes alleged in Counts Four and Five;

i.  Whether defendants were unjustly enriched by plaintiff and the Class and should be required to disgorge the benefits conferred on it as alleged in Count Six;

j.  Whether plaintiff and the Class are entitled to equitable and injunctive relief and the nature of such relief.

46.   Class action treatment is superior to any other method for the fair and efficient adjudication of this controversy.  Class action treatment will permit, among other things, (1) millions of similarly situated persons to prosecute their claims in a single forum avoiding the duplication that individual actions would require and (2) adjudication of the Class' relatively small claims which would otherwise go unaddressed because the expense of prosecuting them would greatly outweigh the potential recovery in any individual action.

47.     There are no difficulties that will be encountered in maintenance of this action that would otherwise preclude its treatment as a class action.

## COUNT ONE

*(PER SE* VIOLATIONS OF § 1 OF THE SHERMAN ACT

(FOR INJUNCTIVE RELIEF ONLY)

48.     Plaintiff repeats and realleges each and every allegation in the preceding paragraphs as if fully set forth herein.

49.     Defendants entered into contracts, combinations and agreements in unreasonable restraint of trade.

50.     These contracts, combinations and agreements constitute *per se* violations of § 1 of the Sherman Act (15 U.S.C. § 1).

51.     Plaintiff has no adequate remedy at law and is threatened with harm to her property by reason of defendants' violations of the Sherman Act.  Accordingly, plaintiff is entitled to injunctive and equitable relief pursuant to § 16 of the Clayton Act (15 U.S.C. § 26).

## COUNT TWO

(QUICK LOOK/RULE OF REASON VIOLATIONS OF § 1 OF THE SHERMAN ACT)

(FOR INJUNCTIVE RELIEF ONLY)

52.     Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

53.     The CME Cheese Spot Call Auction market is a relevant market.

54.     The anticompetitive effects of the agreements into which defendants entered herein outweighed any purported procompetitve benefits in the relevant market or any market.

13

55.     These agreements caused prices in the relevant market to rise and the amount of cheese sold in the relevant market to decrease.  It also caused the prices for wholesale milk and cheese to rise and production and the amount of wholesale milk and cheese purchased to decrease.

56.     By reason of the foregoing, defendants have violated § 1 of the Sherman Act.

COUNT THREE

(MONOPOLIZATION IN VIOLATION OF § 2 OF THE SHERMAN ACT)

(AGAINST DFA ONLY)

(FOR INJUNCTIVE RELIEF ONLY)

57.     Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

58.     DFA wrongfully acquired monopoly power in the relevant market.

59.     DFA's monopolization of caused prices in the relevant market to rise and the amount of cheese sold in the relevant market to decrease.  It also caused the prices for wholesale milk and cheese to rise and production and the amount of wholesale milk and cheese purchased to decrease.

60.     By reason of the foregoing, DFA violated § 2 of the Sherman Act.

61.     Plaintiff has no adequate remedy at law and is threatened with harm to her property by reason of DFA's violations of the Sherman Act.  Accordingly, plaintiff is entitled to injunctive and equitable relief pursuant to § 16 of the Clayton Act (15 U.S.C. § 26).

COUNT FOUR

(STATE STATUTES)

62.     Plaintiff repeats and realleges each and every allegation contained in the

14

preceding paragraphs as if fully set forth herein.

63.    Defendants' wrongful conduct violates the statutes in the following states and District of Columbia:

 a. Arizona  (A.R.S. § 44-102);

 b. California (Cal. Bus. & Prof. Code § 16726);

 c. District of Columbia (D.C. Code Ann. § 28-4502);

 d. Florida (Fl. Stat. § 501.204);

 e. Illinois (740 Ill. Comp. Stat. 10/3);

 f. Iowa (Iowa Code § 553.4);

 g. Kansas (Kan. Stat. Ann. § 50-112);

 h. Maine (ME Rev. Stat. Ann., Tit, 10, § 1101);

 i. Massachusetts (G.L. c. 93A, § 9);

 j. Michigan (Mich. Comp. Laws § 445.772);

 k. Minnesota (Minn. Stat. § 325D.51);

 l. Mississippi (Miss. Code Ann. § 75-21-3);

 m. Montana (Montana Code § 30-24-205);

 n. Nebraska (Neb. Rev. Stat § 59-801);

 o. Nevada (Nev. Rev. Stat. 589A.060);

 p. New Hampshire (N.H. RSA 358-A:2, XIV)

 q. New Mexico (N.M. Stat. Ann. § 57-1-3);

 r. New York (N.Y. Gen. Bus. Law § 340);

 s. North Carolina (N.C. Gen. Stat. § 75-1);

 t. North Dakota (N.D. Cent. Code § 51-08.1-02);

u.   South Dakota (S.D. Codified Laws Ann. § 37-1-3.1);

v.   Tennessee (T.C.A. § 47-25-101);

w.   Tennessee (T.C.A. § 47-18-104);

x.   Vermont (9 Vt. Stat. Ann. § 2453(a));

y.   West Virginia (W.Va. Code § 47-18-3); and

z.   Wisconsin (Wis. Stat. § 133.14).

## COUNT FIVE

### (STATE STATUTES)

64.    Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

65.    Defendants' conduct had the purpose and effect of raising prices that consumers paid for Cheese Products in New York, Pennsylvania and Rhode Island.

66.    Consumers in New York, Pennsylvania and Rhode Island were targets of defendant's wrongful conduct.

67.    Defendants omitted material information that made the statements about the cause of the price increases materially misleading, and also made affirmatively misleading statements about the real cause of price increases.  These false and misleading statements were made to consumers in New York, Pennsylvania and Rhode Island.

68.    Defendants' wrongful conduct caused Class members who indirectly purchased Cheese Products in New York, Pennsylvania and Rhode Island -- for their own use and not for resale -- to pay more for those Cheese Products than they would have in the absence of defendants' unlawful trade practices.

69.    By reason of the foregoing, defendant violated N.Y. Gen. Bus. § 349, 73 P.S. §

16

201-3 and R.I. Gen. Laws § 6-13.1-2.

COUNT SIX

(UNJUST ENRICHMENT)

70.     Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

71.     Through paying more for Cheese Products than they would have in the absence of defendants' wrongful conduct, plaintiff and the Class have conferred a benefit on the defendants.

72.     As a result of defendants' wrongful conduct, defendants were able to charge more for wholesale milk and cheese, which overpayments were made by plaintiff and the Class.

73.     Defendants have been unjustly enriched by overpayments made by plaintiff and the Class.  Equity demands that defendants be required to make restitution and return the overpayments to plaintiff and the Class.

PRAYER FOR RELIEF

WHEREFORE, plaintiff respectfully prays that the Court enter judgment as follows:

a.     Determining that this action may be maintained as a class action pursuant to Rules 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure;

b.     Enjoining defendants from manipulating any market on the CME and ordering such other relief to remediate the market and contractual conditions that would render such wrongful behavior profitable in the future;

c.     Awarding plaintiff and the relevant Class members compensatory damages under the state statutes in an amount to be proven at trial, trebled according to law against defendants, jointly and severally;

d.     Awarding plaintiff and the relevant Class members compensatory damages in an

17

amount to be proven at trial under the state unfair competition, consumer protection and deceptive trade practices laws;

      e.      Awarding plaintiff and the relevant Class members punitive, exemplary, statutory, and full consideration damages under the state laws that permit such recoveries;

      f.      Ordering defendants to disgorge their profits earned as a result of their wrongful conduct and ordering them to make restitution to plaintiff and the Class;

      g.      Awarding plaintiff and the Class pre-judgment and post-judgment interest;

      h.      Awarding plaintiff and the Class their costs of suit, including reasonable attorneys' fees; and

      i.      Granting plaintiff and the Class such other and further relief as the Court deems just and proper.

### JURY TRIAL DEMAND

Pursuant to Rule 37(b), Federal Rules of Civil Procedure, plaintiff and the Class demand a trial by jury on all claims alleged herein that are so triable.

Dated: May 28, 2009

LEVITT & KAIZER

By: _____
           Matthew S. Wild

148 East 78th Street
New York, N.Y. 10075
Tel. (212) 737-0400
Fax (212) 396-4152
mwild@richardlevitt.com

Attorneys for Plaintiff Jacqueline M. Rudman